# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Samuel Zean, Eunice Zean

        Claimants.

vs.

David Madgett, Madgett Law, LLC

        Respondents.

Court File No: 0:17-cv-03817-JNE/HB

Case File No. 0:17-cv-05117

**RESPOND AND COMPLAINT**

CLAIMANTS, as and for their causes of action against the above-named RESPONDENTS, state and allege as follows:

## INTRODUCTION

We realize that normally, it would be unpractical and ill-advised to change an attorney in the middle of any active ongoing case. However, certain usual circumstances demanded that we do so even to our disadvantage even if it meant losing both Wells Fargo and Comcast cases.

On May 1, 2018, we discovered that David Madgett was engaging in conduct that was questionable and exhibiting behaviors that were criminal in nature. Our discovery was only possible after we demanded that David Madgett make a disclosure to us about documents he had intentionally hidden from us for months even after our repeated demands that he release them.

We discovered further that David Madgett has from day one perpetrated a scam and has dealt with us in bad faith, with his continuous misrepresentations and distortions; thus, damaging us further. Hence, we confronted David Madgett about the matter and he immediately exploded in anger and emailed us, stating that he will withdraw from representing us and was moving to file a motion.

A day or two later he was right back at it on his scam, attempting to mislead us that Wells Fargo has proposed to settle out our case. Realizing it was an attempt to distract us, we then informed him that we accepted

1

SCANNED

MAY 3 1 2018

U.S. DISTRICT COURT ST. PAUL

his withdrawal, and that we had written the judges in both cases (Wells Fargo and Comcast matters), notifying them that he was no longer representing us as our counsel.

Once David Madgett knew that we meant it and weren't turning back, he emailed Samuel Zean on Tuesday, May 22, 2018 at 6:11 p.m. and said: **"People joke around about what a nut you are."**

David Madgett was angry that Samuel Zean questioned his activities and accused Samuel Zean of suing everyone he's come in contact with.

Although David Madgett's insult to Samuel Zean was unwarranted and grossly exaggerated, ironically, it was David Madgett himself whom had added a total of six lawsuits to Samuel Zean's record, and now he is suddenly blaming Samuel Zean for exercising his legal right in the past as if Samuel Zean had ever committed a crime.

Samuel Zean has never in his life, filed any frivolous lawsuit anywhere. And although he is not a lawyer, he knows has rights and has only exercised his legal rights when necessary against people like David Madgett who have taken advantage of him and his family.

Mr. Madgett immediately sprang into action in an attempt to cover his tracks and actively sought information from us through cunning and crafty means, and once he got the information he wanted, Mr. Madgett rushed ahead of us and filed a complaint with this Court and also simultaneously filed with ValueSolve ADR an Arbitration firm wherein he intentionally made misrepresentations sound true and even falsehoods sound believable.

Hence, we have decided not to make this dispute about his misleading words just against ours, alone, but will let the direct evidence imbedded (copied and paste) in this complaint, discredit, disprove and expose such unlawful conduct displayed by Mr. Madgettt as mentioned earlier.

### STATEMENT OF VENUE & JURISDICTION

1. Madgett Law LLC is a law firm and business located in Minneapolis, Minnesota.

2. Mr. Madgett is an attorney who currently does business in Hennepin County, and a resident of Minnesota.

3. Samuel Zean is a current resident of Hennepin County and resident of the state of Minnesota.

4.      Eunice Zean is a current resident of Hennepin County and resident of the state of Minnesota.

5.      Samuel Zean and Eunice Zean ("we") and ("us") are a married couple.

6.      This court has current jurisdiction of dispute, as it involves a dispute arising from the illegal and wrongful conducts of Mr. Madgett including his perpetration of fraud, fraudulent misrepresentation, fraudulent nondisclosure, misrepresentation falsification, forgery, aggregated forgery, theft, criminal wrongdoing, distortion, blackmail, gross ethic violation, legal malpractice and premeditated attempt to defraud this court with misleading complaint and demands even under the oath of perjury.

## RESPOND AND FACTUAL ALLEGATIONS

7.      We do not have currently knowledge to truthfully answer paragraph 1 of Mr. Madgett's complaint and demand but answer yes to paragraphs 2,3 and 4.

8.      We fervently deny paragraphs 5 through 60 of Mr. Madgett's Complaint and Demand.

9.      We do not have any valid agreement with Mr. Madgett and dispute the validity of his agreement and will prove that first, he intentionally voided the agreement we signed to perpetrate a fraud.

10.     And second, David willfully altered his already forged agreement in order to legally bind us to arbitration to distort/extort unwarranted funds and our settlement funds from us and to give him the legal authority to put liens on us, our cases and our house.

11.     Mr. Madgett responded as follows: **"Samuel, shoot me a call at the office number listed below.  If I miss you, be sure to leave a message."**

12.     We than placed a phone call to Mr. Madgett on Wednesday, June 28, 2017 and spent about 30 minutes with Mr. Madgett on the phone explaining our case to him.

13.     We were very explicit to Mr. Madgett that we did not have money and could not afford an hourly rate attorney fee and were seeking an attorney that would represent us on a contingency fee basis.

14.     Mr. Madgett then instinctively told us that all of our claims had attorney fees award and most of our claims are represented on a contingency fee basis anyway…for example, TCPA, FCRA, and FDCPA etc.

15.     Mr. Madgett further told us that his contingency agreement was a split of 45% to his firm and 55% to his client and that if we do not recover we owe the firm nothing for legal services.

16.     Strangely and interestingly, Mr. Madgett seemed very excited about our case even more than we were, to our surprise.

17.     Mr. Madgett immediately agreed to represent us, with the exact words: **"Let go nail Wells Fargo and make them pay for what they've done to you;"** a phrase he often used to us, when excited.

18.     For example, Mr. Madgett also states as follows on Monday, 7/31/2017, at 3:11 PM: **"Samuel, quick update. Wells Fargo has been served! We're going to make these guys pay."**

19.     Mr. Madgett indicated that he would email us his representation agreement immediately that same day that would thus, indicate that we had retained him and his law firm Madgett Law LLC to represent us against Wells Fargo.

20.     However, at 2:24 p.m. when we did not receive the representation agreement, we emailed Mr. Madgett on that Wednesday, June 28, 2017 and said as follows: **"Hi David, I am still waiting to receive the retainer and your schedule for Monday.  I hope to begin emailing you some important document/evidence and facts about the case."**

21.     The retainer mentioned in Samuel Zean's correspondence above was in referenced to the representation agreement Mr. Madgett promised to email us. Soon thereafter, Mr. Madgett emailed Samuel Zean his contingency representation but left out Eunice Zean's name.

22.     At 4:42 p.m. on Wednesday, June 28, 2017, Samuel Zean again emailed Mr. Madgett and said as follows:

> **"David, I received the document, but it does not include my wife name.  Sorry, I didn't tell you but we both owed our home and are both on the mortgage loan.  Her name is Eunice Zean. Zeans v. Wells Fargo, please resend it. Thanks."**

23.     At 4:43 p.m. on Wednesday, June 28, 2017, Mr. Madgett responded and said: **"No problem! I'll get that changed and sent over."**

24.     At 8:41 a.m. Thursday, June 29, 2017, Samuel Zean emailed Mr. Madgett and said as follows:

**"Good morning David, please do not forget to revise and resend the retainer document this morning so that my wife and I can sign it before we travel two hours from now.  I have an interesting new fact about our case to discuss with you on Monday."**

25.    At 9:02 a.m. on Thursday, June 29, 2017 Mr. Madgett emailed Samuel Zean and said, **"What's your wife's email address?"**

26.    Mr. Madgett followed on his promise and emailed us his representation agreement on Thursday, June 29, 2017 via DocuSign.

27.    We promptly singed the representation agreement electronically via DocuSign and submitted.

28.    Our completed copies were automatically emailed to both of us, absent Mr. Madgett's DocuSign signature.

29.    We had originally scheduled to meet with Mr. Madgett on Monday, July 3, 2017 to bring in a bunch of documents and emailed him at 3:51 p.m. Thursday, June 29, 2017, as follows: **"Dave, you haven't said when and where to meet on Monday."**

30.    At 4:13 a.m. on Monday, July 3, 2017, Samuel Zean emailed Mr. Madgett and said as follows: **"Thanks David for agreeing to represent my wife and I and we promised not to let you down with the information we promised. I certainly look forward to meeting with you later today…"**

31.    But strangely, Mr. Madgett failed to return his signed copy of the representation agreement.

32.    For some strange reason Mr. Madgett decided to change our scheduled meeting with him on Monday, July 3, 2017 to Wednesday, July 5, 2017 for reason that was unknown to us at the time.

33.    Hence, he responded as follows on Monday, July 3, 2017: **"Hi Samuel, are you available to meet Wednesday? My wife planned an event for today, and I have to shift some things around."**

34.    When Samuel Zean spoke with Mr. Madgett after Mr. Madgett accepted to represent their case on the phone, Samuel asked Mr. Madgett how soon he thought he could file the case because he had an upcoming very major 9 hours brain surgery.

35.    David Madgett instantly and strangely took a particular interest and wanted to know how major the surgery would be and deceivably asked if things would be fine.

5

36.     Now, we understand why he suddenly changed the original date that he and Samuel Zean were originally scheduled to meet from Monday, July 3, 2017 to Wednesday, July 5, 2017 in order to plan a scam should something happen to Samuel Zean during that surgery and what he would later tell Eunice Zean about the agreement.

37.     This explains his conduct, and motive and what happened thereafter as is explained below and throughout this complaint.

38.     At 9:02 a.m. on Monday, July 3, 2017, we responded to Mr. Madgett as follows:

**"Yes, no problem David.  Do what you have to do and accommodate your wife.  We can meet on Wednesday instead as you suggested.  I will be at your office at about 10:30 am or 11 am.  In that case, I will be able to email you all the other information and attachments today and tomorrow."**

39.     Samuel Zean had scheduled to meet with David Madgett at 10:30 a.m. or 11 a.m. at his office at 619 SOUTH TENTH STREET, SUITE 301 MINNEAPOLIS, MINNESOTA 55404, but couldn't and didn't meet David Madgett until 1 p.m. on Wednesday, July 5, 2017.

40.     However, what we neither know nor realize at the time, is that this was a setup, planned by David Madgett to forge the representation agreement by deliberately deleting his representation agreement and failing to sign or add his digital signature to the agreement via DocuSign.

41.     Mr. Madgett printed copies of our signed DocuSign agreement before deliberately deleting and voiding the agreement without signing the agreement himself thereby invalidating the agreement unknown to us immediately before Samuel Zean dropped off some unrelated case documents to him, after 1 p.m. and left.

42.     The ten minutes that Samuel Zean spent in the building's general conference room with Mr. Madgett, Mr. Madgett said nothing about the representation agreement, failed to give Samuel Zean his signed copy of the representation agreement but engaged Samuel Zean in an overly optimistic discussion about case that we had and the multiple good claims he thought we had.

43.     Mr. Madgett that day never once expressed concerns about our primary concern which was Wells Fargo's

unfair and unjust treatment in taking our money, then terminate our agreement with it and its threats of foreclosing

our home.

44.     Rather his focus was on our claims and how we will nail them. It was all about what he would make Wells

Fargo pay.

**The Arguments on Pages 1 through 5 Continues On Page 11**

**EVIDENCE THAT EXPOSES DAVID MADGETT'S WILLFUL LIES, AND SHOWS THAT HE INTENTIONALLY VOIDED OUR AGREEMENT WITH HIM, COMMITTED AGGREGATTED FORGERY BY ILLEGALLY ALTERING THE AGREEMENT IN OUR ABSENCE AND HIDE THAT FACT FROM US FOR NINE MONTHS.**

45.     David Madgett misleadingly alleges as follows in his Complaint:

> "2. On July 5, 2017, Counsel finished his evaluation and accepted Respondents' matter based on additional conditions. 3. On July 5, 2017, Counsel met with Mr. and Mrs. Zean in person to discuss the matter and Madgett Law's representation of Zeans. 4. *At the meeting, Counsel provided the Zeans with hard copies of the contingency agreement between the parties.* 5. Because Counsel added additional conditions to the firm's standard agreement, Counsel later voided the Zeans' signed online contingency agreement: *The Zeans later confirmed in writing that they received the notice of decline of the firm's standard contingency agreement.* 6. By the terms of the hybrid contingency agreement between the parties, Mr. and Mrs. Zean agreed to pay the greater of $375.00 per hour or 45% of any recovery: It was also agreed that the hourly rate, if used to calculate counsel's fee, would not exceed Respondents' total recovery. 7. On July 17, 2017 Counsel commenced the matter Samuel and Eunice Zean v. Wells Fargo Bank, N.A.; Experian Information Solutions, Inc.; Equifax Information Services, LLC; Trans Union, LLC." 40. *In a valid agreement finalized on July 5, 2017, Respondents agreed to pay for the costs of legal services.*

46.     **Mr. Madgett stated as follows: "On July 5, 2017, Counsel finished his evaluation and accepted**

**Respondents' matter based on additional conditions."**

47.     The quoted play by play email correspondences on pages 1 and 2, of this complaint are direct evidence

that shows Mr. Madgett intentionally fabricated all his statements above, in order to defraud or mislead the Court

**(See Exhibit A).**

48.     Mr. Madgett craftily solicited information from us after we accepted his withdrawal and pretended to be

acting in good faith in his repeated requests of information from us as if to resolve our dispute with him promptly.

49.     For example, Mr. Madgett say as follows in his Complaint: "**_The Zeans later confirmed in writing that_**

**_they received the notice of decline of the firm's standard contingency agreement_**."

50.     Mr. Madgett intentionally linked this claim he made above with his fabricated and make-believe event of

Samuel Zean's meeting with him on July 5, 2017 in order to misleadingly link the two and establish fact.

**HERE NOW COMES THE TRUTH**

51.     Mr. Madgett emailed us and pretended as if he wanted to know the basis of our complaint against him

when he had not filed anything with the Court, except his initial motion to withdraw.

52.     On Thursday, May 17, 2018 at 5:36 p.m. that same day Samuel Zean responded: **"I am working on it**

**currently."**

53.     But Mr. Madgett emailed us again on Thursday, May 17, 2018 and asked as follows: **"We don't need**

**facts or evidence, I'm just trying to simply figure out what your complaint is."**

54.     Unknown to us, Mr. Madgett was attempting to seek information about what our complaint against him

specifically was so that he would not only preempt everything we intended to report against him, but so that he

could also rush with his own complaint he was secretly drafting ahead of us and file his before we did.

55.     On Tuesday, May 22, 2018, at 11:56 a.m., Mr. Madgett finally emailed us and said as follows: **"See**

**attached which was filed today."**

56.     This explains the reasons for his nonsensical explanation as if rumbling in his intentional

misrepresentations in paragraphs 1,2,3,4,5,6,7, and 40 and everywhere else throughout his complaint **(See**

**Exhibit B)**.

57.     Mr. Madgett wanted us to be as specific as possible to be able to tailor his own complaint and preempt

what he anticipated we would say.

58.     . We saw David Madgett for who he truly is and so emailed him the following on:

> **"Please consider this is not a request but a demand.  We demand that you ask the judges**
> **in both our Wells Fargo and Comcast cases to put three months to six months stay on**
> **these cases until further notice.  We have decided to write you and the judges concerning**
> **our reasons and legal rationales for requesting such "stay" to the proceedings. You will**

also know our reasons during the same time as when our request to the judges are made or perhaps before. We cannot say anything further concerning this now, nor disclose our reasons for demanding these actions now."

59.    David Madgett wanted us to be as specific as possible to be able to tailor his own complaint and preempt

what he anticipated we would say.

60.    David Madgett emailed us as follows on Thursday, May 17, 2018:

"Hi Samuel, regarding your email about the stay, are you planning on directly contacting the judges? If so, do you want to release me as counsel? *I'll waive much of the outstanding bill if you are planning on releasing me.* Regarding making a motion, I can't make a motion without a sufficient basis and without meeting an conferring with opposing counsel. Logically, I'd need a lot more info about why you want a stay to effectively represent your interests. You might have additional options representing yourself. Please let me know."

61.    David Madgett tactically began attempting to coerce us by saying, he will waive much of his outstanding

bill if we are planning on releasing him.

62.    Mr. Madgett emailed us back on Thursday, May 17, 2018 and asked as follows:

"Also, I need to know what the basis for your complaint is. I have to file a memo today, so I really need you to reply to my previous email requesting you confirming the basis for your dispute."

"You don't dispute our attached contingency agreement, but you say under the current law it is not conscionable because my firm could under some situations be entitled to 100% of the fees."

"You don't dispute our attached contingency agreement, but you say under the current law it is not conscionable because my firm could under some situations be entitled to 100% of the fees."

"I'd like to work this out with you in the quickest easiest way."

63.    Of course, as usual, Mr. Madgett was deceptive and misleading and did not file any memo anywhere on

Thursday, May 17, 2018

64.    Notwithstanding, Samuel Zean responded and said as follows on Thursday, May 17, 2018: "Hi David:

See our response to your questions in the first attachment and exhibits in the second attachment."

65.    That was the big break that Mr. Madgett was seeking, and he got on a silver platter.

66.    Mr. Madgett is cunning and deceptive.

67.     Mr. Madgett came under the disguise of how he wanted *to work this out with us in the quickest easiest way.*

68.     For the first time since Mr. Madgett made us to sign the Wells Fargo representation agreement online through DocuSign, it was the very first time that Mr. Madgett has disclosed to us why he had refused to give us his signed copy of the agreement all this time.

69.     At first glance, a simple look at Mr. Madgett's agreement which he only recently shown us on May 17, 2018 when compared to the only agreement we have had for almost one year now, which we signed through DocuSign on June 29, 2017 shows serious discrepancies and inconsistencies **(See Exhibit C, David Madgett's Forged, Voided and Altered Agreement, His Forged Letters and Extended Provision).**

70.     Our copy of the agreement does not have Mr. Madgett's digital signatures which voided the agreement, doesn't have handwritings on it, has a clear readable and unique identification key under Samuel Zean's name and digital signature unlike Mr. Madgett's voided and altered copy **(See Exhibit D, Claimants' Original DocuSign Agreement they signed digitally on June 29, 2017.).**

71.     Notice he craftly said:

> **"You don't dispute our attached contingency agreement, but you say under the current law it is not conscionable because my firm could under some situations be entitled to 100% of the fees."**

72.     Mr. Madgett had illegally voided the original agreement we sign on DocuSign, and unilaterally prepared a new one which he altered and wanted us to agree we did not dispute, so that he could use that admission against us later in arguing we didn't say we disputed it.

73.     Mr. Madgett realized that he had unwisely overplayed his hands in threatening to withdraw from being our counsel in both our Wells Fargo and Comcast cases; something he had repeatedly threatened us with doing.

74.     We had never accepted his withdrawal proposals until recently on May 12, 2018 to his greatest surprise and regret.

75.     Mr. Madgett's representation agreement says as follows:

"**M. Should I fail to follow my attorney's instruction, misrepresent or fail to disclose material facts, or fail to provide any requested payment or security, my attorney is authorized to withdraw as my counsel, to file suit, and to take such other steps as he or she deems appropriate. I will execute any documents necessary to allow my attorney to withdraw at that point. The Firm reserves the right to terminate this contract if at any time our attorneys conclude that the claim is without merit.**"

76. Even if Mr. Madgett's representation agreement wasn't intentionally voided and/or altered by him which we only discovered on May 17, 2018 and a fact, he himself was compelled to admit to doing in his complaint after we disclosed our discovery to him, we still did nothing that breached his agreement.

77. What's more, his agreement doesn't have any specific, direct or indirect provision that says, if the attorney/counsel withdraws, the client would still be required to pay him regardless up to the time he that withdrew.

78. Mr. Madgett's agreement however, has the following provision:

"**If I choose to terminate this agreement prior to full and final resolution, I agree to compensate the Firm at the above-specified rate for all work performed up to the date of any such termination and all costs incurred to that point.**"

79. We did not fire Mr. Madgett but rather accepted his withdrawal from representing us, although it wouldn't have matter even if we had terminated him since by his own admission he voided our only existing agreement with him and altered both the Wells Fargo and Comcast's agreements which were exactly identical in terms and provisions when we signed them.

80. We initially signed those agreements without Mr. Madgett's subsequently added modification and unconscionable other provisions he unilaterally and illegally forged and attached to the agreement in order to legally bind us based on such modifications and added provisions.

81. Realizing this, Mr. Madgett retrieved the printed copy of the DocuSign agreement which he printed about 9 months ago on July 5, 2017 before failing to DocuSign it and deleted.

82. Mr. Madgett finally signed that printed copy recently during our dispute with him between May 1, 2018 and May 17, 2018 which he was obviously keeping for devious purposes and wrote an attached provision on the printed copy, then drafted two letters which he backdated to July 5, 2017 and July 6, 2017 and emailed it to us in order to solicit our reactions.

83.     Of course, we disputed this with Mr. Madgett after going into our email accounts to locate any automatic

sent copies of the DocuSign agreement that might have come in our inbox unknown to us and undiscovered.

84.     After doing some keywords searching we finally located a couple of the automatic DocuSign emails in

our junk mails on May 17, 2018 still unread.

85.     One of the automatic DocuSign emails indicated that Mr. Madgett had voided his representation

agreement with us on July 5, 2017 disclosed and hidden from us. We will explain this in detail further below about

motive and intention for why he intentionally voided the agreement.

86.     Mr. Madgett had tactically emailed us his misleading, altered and voided his agreement on May 17, 2018

for the purpose of testing us to see our reactions to his forgery for the first time and to communicate to us that he

has something on us.

87.     Hence, in our response to Mr. Madgett on Thursday, May 18, 2018, we informed Mr. Madgett that he

intentionally voided his agreement with us on July 5, 2017 based on the information we had discovered.

88.     We also informed Mr. Madgett that he didn't have any valid, existing or enforceable contract with us

during the time that he represented us, and had been pretending all this time, which explains why he wouldn't

give us a signed copy of the agreement,  because of fear we will discover his forgery and dispute and terminate

him.

89.     This disclosure by us explains why Mr. Madgett otherwise, adjusted his argument and tailored it with the

following unnecessary and irrelevant details explanation:

> "On July 5, 2017, Counsel finished his evaluation and accepted Respondents' matter
> based on additional conditions. 3. On July 5, 2017, Counsel met with Mr. and Mrs. Zean
> in person to discuss the matter and Madgett Law's representation of Zeans. 4. _At the_
> _meeting, Counsel provided the Zeans with hard copies of the contingency agreement_
> _between the parties_. 5. Because Counsel added additional conditions to the firm's
> standard agreement, Counsel later voided the Zeans' signed online contingency
> agreement."

90.     Mr. Madgett then cleverly and conveniently added this misleading information in his complaint when he

said: "_**The Zeans later confirmed in writing that they received the notice of decline of the firm's standard**_

_**contingency agreement**_."

12

91.     What Mr. Madgett is here referencing is our discovery of his fraudulent conduct on Thursday, May 17, 2018 and our response to him about that discovery on Friday, May 18, 2018.

92.     What we did not know with certainty is that Mr. Madgett would use the information he had gathered from us in his complaint, nor did we know he was drafting a complaint which he rushed to file later that same day on Monday, May 21, 2018 at 11:11 p.m. in his attempt to neutralize our discovery should we report in our complaint.

93.     In an emailed correspondence we subsequently emailed Mr. Madgett on Monday, May 21, at 3:58 p.m. prior to him filing his complaint, we specifically predicted to Mr. Madgett, his intention and motive for why he requested the information from us like a crystal ball as follows:

> "**Your intention for emailing us on 5/17/2018 and asking us questions was not to file a memo on Thursday, May 17, 2015 as you again so misleadingly told us in your email as follows:** *'Also, I need to know what the basis for your complaint is. I have to file a memo today, so I really need you to reply to my previous email requesting you confirming the basis for your dispute.'* **The information you requested above was to rather gather information from us, on us that you would strategically use to your advantage against us to defend yourself. Additionally, it was also designed to tactically and cunningly have us admit having received, reviewed and approved your forged documents you also sent in that email attachment on Thursday, May 17, 2017 and to say that we did not object to the specific representation agreement in the attachment and the attached documents that companied your mail."**

**The Arguments on Pages 1 and 2 Continues**

94.     The play by play chain of email correspondences **(Exhibit A)** discussed on pages 1 and 2, of this complaint show that Mr. Madgett initially evaluated our case on June 26, 2017.

95.     He thereafter contacted us very promptly via email on June 27, 2017 at 12:28 am after receiving our case summary and after evaluating it.

96.     Mr. Madgett responded as follows: **"Samuel, shoot me a call at the office number listed below.  If I miss you, be sure to leave a message."**

97.     The email evidence shows that we placed a phone call to Mr. Madgett on Wednesday, June 28, 2017 based on his request to call him. We spent about 10 to 15 minutes with Mr. Madgett on the phone explaining our case to him.

98.      Mr. Madgett accepted our case over the phone and told us we had a good case and he would email us his representation agreement.

99.      The evidence shows that at 4:42 p.m. on Wednesday, June 28, 2017, Samuel Zean received an actual representation agreement from Mr. Madgett after our discussion with him on the phone.

100.     The email evidence again shows that on Thursday, June 29, 2017, Samuel Zean and Eunice Zean received a revised representation agreement from Mr. Madgett and signed it and submitted it.

101.     The evidence is clear, undeniable and indisputable. It is not unfounded, baseless or based on misleading.

102.     Mr. Madgett stated as follows: **"On July 5, 2017, _Counsel met with Mr. and Mrs. Zean_ in person to discuss the matter and Madgett Law's representation of Zeans."**

103.     Again, the explanation and play by play email correspondences we quoted **(Exhibit A),** are direct evidence that shows that Mr. Madgett intentionally fabricated his statement yet again above in order to deceive or mislead the Court.

104.     The following statement by Mr. Madgett's own account unequivocally shows that Samuel Zean met with Mr. Madgett alone and Mr. Madgett knew that Samuel Zean had scheduled to meet with him alone:

> **"Hi Samuel, _are you_ available to meet Wednesday? My wife planned an event for today, and I have to shift some things around."**

105.     The following response from Samuel Zean unequivocally shows that Samuel Zean met with Mr. Madgett alone and Mr. Madgett knew that Samuel Zean scheduled to meet with him alone at 9:02 a.m. on Monday, July 3, 2017:

> **"Yes, no problem David.  Do what you have to do and accommodate your wife.  We can meet on Wednesday instead as you suggested.  _I will be at your office_ at about 10:30 am or 11 am.  In that case, I will be able to email you all the other information and attachments today and tomorrow."**

106.     Another text from Samuel Zean, on Wednesday, June 28, 2017, at 2:24 p.m. **"We will talk Comcast 100 calls _when I come_ over on Monday."**

107.     Another text from Samuel Zean, on Wednesday, June 29, 2017, at 8:41 a.m. **"I have an interesting new fact about our case to discuss with you on Monday."**

14

108.   Besides, because Mr. Madgett only met with Samuel Zean on Wednesday, July 5, 2017, he intentionally forged a letter which he only recently for the first time disclosed to us on May 17, 2018 at 12:45 which he fraudulently designed and then backdated specifically to July 5, 2017 to establish evidence or alibi.

109.   That letter however, was not also addressed to Eunice Zean who is also a plaintiff in the Wells Fargo matter and a potential client of Mr. Madgett if we are to accept his pretext.

110.   It was only specifically addressed to Samuel Zean and referenced him continuously in the letter.

111.   This evidence also show that Eunice Zean did not accompany her husband Samuel Zean at Mr. Madgett's office on Wednesday, July 5, 2017 which is why Mr. Madgett instinctively only mentioned Samuel Zean in his premeditated forged letter to begin with, which he forged on or before May 17, 2018.

112.   However, when he thought of misleading this court and his other intended audience that would read his complaint, he later forgot when drafting his complaint that had involuntarily acknowledged he met with only Samuel Zean on July 5, 2017 and so instinctively addressed his forged letter to him alone.

113.   This is evident yet again that Eunice Zean did not accompany her husband as Mr. Madgett claimed.

114.   Mr. Madgett also stated as follows: **"At the meeting, Counsel provided the *Zeans* with hard copies of the contingency agreement *between the parties*."**

115.   Again, the play by play email correspondences we quoted **(Exhibit A),** is direct evidence that shows that Mr. Madgett intentionally fabricated his statement yet again above in order to deceive or mislead the Court.

116.   First, it is established based on evidence that Eunice Zean did not meet with Mr. Madgett on July 5, 2017.

117.   Second, even importantly, the following evidence shows that Mr. Madgett did not give Samuel Zean any hard copies of any contingency agreement.

118.   On Thursday, July 6, 2017 at 12:17 p.m. Samuel Zean emailed Mr. Madgett and said as follows:

> **"Hi David, it was nice meeting with you yesterday, and my wife and I want to thank you for accepting our cases and is willing to represent us against Wells Fargo and Comcast. *Can you please send us our copy of the retainer agreement?*"**

119.   Indeed, Samuel Zean for the second time, expressed he and his wife's gratitude to Mr. Madgett for accepting to represent their cases.

120.    The first time was three days earlier on Monday, July 3, 2017 at 4:13 a.m. in an email correspondence

to Mr. Madgett as follows:

> **"Thanks David for agreeing to represent my wife and I and we promised not to let you down with the information we promised. I certainly look forward to meeting with you later today.**

121.    Locally, if Mr. Madgett was only evaluating our agreement by July 3, 2017, when why did we thank him

for agreeing to represent us?

122.    Additionally, if both Samuel Zean and Eunice Zean had met with Mr. Madgett on July 5, 2017 as he

misleadingly claimed, Samuel Zean would have said, my wife and I want to thank you for meeting with us

yesterday.

123.    Instead, Samuel Zean instinctively said, **"it was nice meeting with you yesterday..."**

124.    Notably, we specifically asked for our copy of the representation agreement the very next day, on June

6, 2017, after Samuel Zean met with Mr. Madgett which unequivocally shows that Mr. Madgett did not give Samuel

Zean any copies of the contingency agreement as he has misleadingly claimed he did.

125.    Otherwise, logically, why would we request our copies of that same representation agreement after Mr.

Madgett had supposedly given Samuel Zean copies of it just the day before?

126.    This sound argument and evidence paints Mr. Madgett as the lair and predictor that he is, who preys on

seemingly defenseless clients with no legal background, who he thinks are uninformed and easy to distort and

extort.

127.    Besides, by Mr. Madgett's own account wherein in his attempt to forge and establish evidence, he

explicitly and unescapably forged a letter that he dated July 6, 2017 that has comes back to bite him: **"Dear Mr.

Zean, Per your request enclosed is a copy of our agreement."**

128.    Indeed, Mr. Madgett, before forging this letter above, he swept through Samuel Zean's email

correspondence to him of Thursday, July 6, 2017 at 12:17 p.m. on paragraph 4 above, and wrote this letter which

he backdated to July 6, 2017 to create the misleading impression that his misleading letter was in response to

Samuel Zean's request for his signed copy of the representation agreement.

129.    At this stage, a computer's forensic of his laptop he used to write these letters are not even necessary to unveil the actual dates and year that he wrote these letters due to the already abundant evidence we have.

130.    But if it comes to that, knowing him as we now do, we are confident he will purposefully destroy his laptop or find the perfect excuse for why it is unavailable.

131.    Mr. Madgett also wrote another misleading letter that states: **"Dear Mr. Zean, I have reviewed your file and Madgett Law LLC agree to accept your case subject to additional provisions."**

132.    Bafflingly, which legitimate representation agreement would subject a client to additional detached provisions that are independent of a contingency agreement?

133.    It shows how staged Mr. Madgett's fraudulent letter is which was only written by him sometime between May 7, 2018 and May 17, 2018 but was backed dated to July 5, 2017.

134.    Even if we are to agree this letter was authentic and we had been given the opportunity to review and consider it on July 5, 2017, it is nevertheless, insulting, disparaging and distasteful for anyone to readily agree to.

135.    If Samuel Zean had truthfully seen that misleading letter and agreed to it, then why isn't his signature or initial shown on the letter or on the additional provision pages.

136.    Besides, Mr. Madgett has never referred to Samuel Zean ever as Mr. Zean or Dear Mr. Zean once whether in addressing Samuel Zean or corresponding with Samuel Zean in any of his countless email correspondences as shown from all his email correspondences in these exhibits.

137.    Not even in his very first or initial email response to Samuel Zean back on June 27, 2017 wherein he said: **"_Samuel_, shoot me a call at the office number listed below.  If I miss you, be sure to leave a message."**

138.    The fact that he forged these two letters and referred to Samuel Zean as Mr. Zean in both shows how misleading and staged his letters are.

139.    The fact is Mr. Madgett recently forged his letter in May 2018 after he saw that we had written the judges overseeing our Wells Fargo and Comcast cases he represented.

140.    Mr. Madgett then pretended to have mailed Samuel Zean the letter on July 6, 2017 in response to Samuel Zean's email correspondence to him highlighted above on page 9, paragraph 4.

141.    Logically, if Mr. Madgett had already provided us with hard copies of the contingency agreement, why did he not object having already given it to us or say even one word about already giving it to us just the day before in an email response.

142.    Even if he had objected but still wanted to send it to us, why did he not just send it to us via email attachment as he just recently done on May 17, 2017, in an attempt to intimidate and blackmail us to keep quiet.

143.    Why did he have to go out of his way to supposedly paid money, traveled to the post office to mail it to us although he has never mailed one single correspondence to us ever through the mail, and cannot prove nor provide any evidence that he has mailed us any letter since the establishment of his representation of us?

144.    Why for almost one year now we have been still literally begging Mr. Madgett through phone calls, in persons and via email correspondences and asking him to please give us his signed copy of our representation agreement but each time he failed to respond, would change the subject or would promise to send it to us via a website he created called Clio but didn't?

145.    On Thursday, May 3, 2018 at 9:06 p.m. we emailed Mr. Madgett as follows:

> **"David, please email me your signed copies of both Wells Fargo and Comcast representation agreements. We only have the copies that we signed and do not have your signatures. We signed both and returned to you but you never give us copies after putting your signatures. The copies I have do not have your signatures but has only my signature on the Comcast's representation agreement, and me and my wife alone on the Wells Fargo representation agreement."**

146.    Not surprisingly Mr. Madgett emailed us back and responded only to other issues relating to our correspondence to him but intentionally refused to respond to our specific request for a copy of his signed representation agreement **(See Exhibit E)**.

147.    For example, on Thursday, May 3, 2017, at 11:02 p.m., we emailed Mr. Madgett as follows: **"I requested that you send us your signed copy of both Wells Fargo and Comcast representations agreements. Please email both to me."**

148.    Not surprisingly again, Mr. Madgett although emailed us back **(Exhibit E)** and responded to other issues about our correspondence to him but again intentionally refused to respond to our specific request for a copy of his singed representation agreement.

149.    On Friday, May 4, 2018 at 12:24 a.m., we emailed Mr. Madgett as follows: **"Again, please send me a copy of your signed representation agreements." (Exhibit E)**

150.    But again, David intentionally refused to respond to our specific request for a copy of his singed representation agreement.

151.    On Friday, May 4, 2018, at 7:56 a.m., we emailed Mr. Madgett as follows: **"We still have your unsigned copy of the Contract and you wouldn't give us your signed copy." (Exhibit E)**

152.    Not surprisingly Mr. Madgett mailed us back and responded to other issues about our correspondence to him but yet again intentionally refused to respond to our specific request for a copy of his singed representation agreement.

153.    On Thursday, May 17, 2018, at 3:58 p.m., we emailed Mr. Madgett as follows: **"Your refusal to give us your signed copy of the Comcast's representation agreement, are evidence demonstrating conducts that are contrary to the very fiber of ethic, professional conduct and rule of law you claimed to represent as an attorney." (Exhibit E)**

154.    Even at that, to date Mr. Madgett has failed and refused to give Samuel Zean one single copy of his signed copy of the Comcast's representation agreement which is no longer difficult to comprehend or figure out because he has altered it like he illegally did with Wells Fargo's.

155.    Mr. Madgett intentionally printed our singed copies of the representation agreement on July 5, 2017, failed to sign it and then deleted it; and thus, voided the contract unknown to us.

156.    Mr. Madgett's aim was to print and keep the unsigned agreement opened, for him to then sign later and backdate it when convenient to defraud and blackmail us if we uncovered his premeditated fraud, dishonesty and deceptive business practices and try to report him.

157.    DocuSign is automatically and electronically designed or set up to ensure that both parties signed the document or agreement to ensure that other party, in this case, the attorney Mr. Madgett doesn't make any unauthorized and undisclosed changes or altering of the agreement after the clients have already electronically sign the agreement on DocuSign.

158.    Hence, he was required to electronically sign the document and not delete it.

159.    However, Mr. Madgett knowingly and strategically voided our agreement with him on July 5, 2017 by intentionally failing to also sign the document when he deleted it.

160.    This explains why Mr. Madgett repeatedly failed and refused to give us his signed copy of the agreement despite our repeated requests for him to do so all this time.

161.    This also explains why Mr. Madgett oddly changed Samuel Zean's appointment with him from Monday, July 3, 2017 to Wednesday, July 5, 2017.

162.    Samuel Zean scheduled to meet with Mr. Madgett for the first time on Monday, July 3, 2017 to drop off their mortgage documents, a pile of other case documents, credit reports and disputes and other correspondences with Wells Fargo at his office.

163.    Mr. Madgett decided to forge an alibi for his false statements he intentionally put in his misleading letter partly quoted below.

164.    Hence, he added the statement below among others in order to legitimize his altered/voided agreement and give weight and credibility to his fabricated agreement he recently created that notably do not bear our signatures.

165.    His fabricated agreement legally grants him the legal authorization to put liens on our actions he represented, and, on our home, which is precisely what he has done. It also falsely subjects and binds us to a compelled arbitration.

166.    Mr. Madgett even misleadingly started as follows in his misleading letter that he recently wrote around May 14-17, 2018 but backdated to July 5, 2017:

> **"First, you have done a fabulous job of documenting your credit report disputes, thus, I recommend expanding this case to bring actions against each of the consumers reporting bureaus, this is not required, but may provide an additional means of recovery. Plus, additional defendants will increase your probability of a quick recovery allowing you to pay down legal fees and providing money for litigation costs which you will be required to pay."**

167.     You can see how smart, crafty and deceiving Mr. Madgett is by his letter he recently wrote in May 2017 and backdated.

168.     First, before Samuel Zean met Mr. Madgett for the first time we didn't even know that TransUnion, Experian and Equifax had wronged us, or that we would have a course of action against them.

169.     As expected, we did not submit any credit report dispute to him via the few email correspondences we emailed him prior to Samuel Zean's July 5, 2017 meeting with Mr. Madgett. **(See Exhibit A, initial email correspondences between Mr. Madgett and Samuel Zean between June 27, 2017 to July 5, 2017).**

170.     Second, July 5, 2017 would have been just eight days from when we got in contact with Mr. Madgett by phone and had not met him when he prepared his letter he supposedly already drafted on the morning of July 5, 2017 and later gave Samuel Zean that same day.

171.     Besides, although Mr. Madgett is an expert at forging and manufacturing misleading documents, he cannot and has not produced any evidence to the contrary from our correspondences to him between June 27, 2017 to July 5, 2017 that shows we attached our credit reports on any of the emails we sent him prior to meeting with him that shows documentation of our credit reports that supports his statement he made (**"First, you have done a fabulous job of documenting your credit report disputes"**) in his prepared letter.

172.     Third, the letter would have been already drafted and printed when Samuel Zean briefly met with Mr. Madgett for 10 minutes on July 5, 2017 in the general conference room of property where he rents.

173.     It would have been possible for Mr. Madgett to magically include into his letter any information from the piles of documents that Samuel Zean gave him at that brief meeting before leaving so as to include such information in the letter already supposedly prepared.

174.     Fourth, Mr. Madgett knows that our dispute with him centered around his failures and refusals to disburse our settlement funds from TransUnion, Experian and Equifax and his failures and refusals to give us his signed copy of his agreements with us.

175.     He knew that his agreement was intentionally voided by him unknown to us.

176.     He knew that just before voiding his legitimate agreement with us by his refusal to sign via DocuSign, he printed copies consisting only of our digital signatures not bearing his digital signature which invalidated the agreement.

177.     He knew he didn't have any retainer, trust funds or legal fees or litigation costs provision in his original agreement and because he misappropriated all of our settlement money by using our funds on himself, he purposely included the statements in his letter he only recently wrote but backdated to July 5, 2017 **(See Exhibit C).**

178.     And fifth, recently we emailed Mr. Madgett on Friday, May 4, 2018 at 12:24 p.m. as follows: **"We do not even have any Contract or Agreement with you in TransUnion, Equifax and Experian. Do you realize that?"**

179.     David Madgett responded on Friday, May 4, 2018 at 1:16 p.m. as follows: **"Find a new attorney and let me know as soon as it is done. I'm going to be filing a motion shortly." (Exhibit E)**

180.     Hence, Mr. Madgett stated as follows in his complaint: **"Because Counsel added additional conditions to the firm's standard agreement, Counsel later voided the Zenas' signed online contingency agreement: The Zenas later confirmed in writing that they received the notice of decline of the firm's standard contingency agreement." (Exhibit B)**

181.     As has been proven, Mr. Madgett intentionally and cunningly sought information from us between May 1, 2018 to May 18, 2018 which then he used to craftily counter and preempt everything he knew we would allege against him in our complaint.

**EVIDENCE THAT ESTABLISHES WHEN OUR CREDIT REPORTS WAS DISCLOSED TO MR. MADGETT**

182.    However, Mr. Madgett failed to realize that there are email communications that give the precise date and time that we submitted and disclosed any information to him that showed when we documented our credit disputes or any mention about TransUnion, Equifax or Experian **(See Exhibit A).**

183.    Samuel Zean had left Mr. Madgett with a pile of documents when he briefly met with him on Wednesday, July 5, 2017 at his office, but Mr. Madgett apparently had not looked in the piles of documents that Samuel Zean left with him; hence, Mr. Madgett emailed Samuel Zean as follows on Monday, July 10, 2017 at 1:22 p.m.: **"We should also pull your most recent credit reports to see if they are listing your payments as past due."**

184.    However, on Monday, July 10, 2017 at 1:49 p.m. Samuel Zean responded as follows:

> **"On my Equifax Credit Report, Wells Fargo deliberately failed and refused to report our payments for March 2017, April 2017, May 2017, June 2017 and July 2017. This adds to others willful inaccurate reporting Wells Fargo sent to Equifax in January 2017, February 2017, and March 2017. On my Experian Credit Report, Wells Fargo deliberately failed and refused to report our payments for January 2016, February 2016, March 2016, April 2016, May 2016, June 2016 and July 2016. On my Transunion Credit Report, Wells Fargo deliberately failed and refused to report our payment for June 2017, and July 2017. This adds to multiple other inaccurate reporting Wells Fargo sent to Transunion in January 2017, February 2017, and March 2017."**

185.    On 7/10/17 at 1:53 p.m., Mr. Madgett responded as follows: **"I think we should probably send a dispute that says you paid on time.... Just a thought..."**

186.    On Mon, July 10, 2017 at 2:09 p.m., Samuel Zean responded:

> **"David, unless there is some special or strategic advantage to this, we will only be wasting our time with Wells Fargo because we have been there and done that with Wells Fargo numerous times already. Example, that attorney, the attorney general and the over 5-10 dispute letters we already sent Wells Fargo produced on effect."**

187.    On Mr. Madgett 7/10/17 at 3:31 a.m., Mr. Madgett responded: "There is a strategic advantage my friend. <u>We can sue under the FCRA only after we first send a qualified dispute to via a consumer reporting agency - Experian, TU, and Equifax</u>."

188.    Notice that Mr. Madgett for the first time proposed us that we can sue Wells Fargo and the credit bureaus under the FCRA on July 10, 2017."

189.    Samuel Zean responded Monday, July 10, 2017 at 3:47 p.m. as follows:

**"We already disputed the FRCA with Wells Fargo, but Wells Fargo refused to make any corrections of its inaccurate reporting and defiantly responded that it was now willing to report any differently. <u>We also disputed it with Equifax, Experian, and Transunion but all three agencies failed to make corrections.</u> Their reinvestigations results are included in the pile of documents I gave you."**

190.   On 7/10/17 4:23 p.m., Mr. Madgett responded: **"Ok, I saw the reports <u>but did not look at them</u>. Nice work!"**

191.   The evidence reveals that not only did Mr. Madgett not taken his time to review the pile of materials that Samuel Zean gave him on July 5, 2017, but he admitted having just reviewed them and said, "Nice work!"

192.   Mr. Madgett further emailed Samuel Zean on Monday, July 10, 2017 at 5:04 p.m. and said: **"Just wait for the complaint I am preparing. :)"**

193.   He further emailed Samuel Zean on Monday, July 10, 2017 at 11:49 p.m. and said: **"Samuel, I've attached a very preliminary statement of facts I intend to incorporate into the complaint."**

194.   By the next day which was Tuesday, July 11, 2017 at 3:03 p.m. Mr. Madgett emailed Samuel Zean as follows: **"I want to have this served Friday. I'm serious about this one. :)"**

195.   Based on Mr. Madgett's correspondences and enthusiasm, it began to dawn on us for the first time that we may have a claim on TransUnion, Equifax and Experian. Hence, we emailed Mr. Madgett on Wednesday, July 12, 2017 at 8:54 as follows:

**Ref: FCRA Claim Against Wells Fargo, Transunion, Equifax, and Experian:** "David, I believe we also have claims to sue Wells Fargo, <u>Transunion, Experian and Equifax under the FCRA for their inaccurate reporting on our credit reports, *right*?"</u>

196.   Take note of the above correspondences, specifically the dates of the discussions and compare it with Mr. Madgett's misleading letter dated July 5, 2017 and his response below to Samuel Zean's specific question above.

197.   On 7/12/17 at 9:26 a.m., Mr. Madgett responded as follows: **"I'm actually researching that right now... Say can we reschedule our meeting."**

198.   This admission by Mr. Madgett is telling as its exposes the falsity and misleadingness of his July 5, 2017 letter. He is caught right handed again in misleading and willful misrepresentation **(See Exhibit A)**.

199.     Not surprisingly, by July 12, 2017, Mr. Madgett did not even know the answer to what he misleadingly claimed he wrote in his misleading letter dated July 5, 2017 although at the time, he never had access to our credit reports when he supposedly wrote the letter.

200.     On Thursday, 7/27/2017, at 10:17 p.m. Mr. Madgett emailed Samuel Zean the finished complaint and said as follows: **"I'd like to get this served tomorrow. Take a look and give me the OK."**

201.     On Friday, July 28, 2017 at 12:47 a.m. Samuel Zean emailed Mr. Madgett back and said as follows:

> **"David, you nailed it!! This is a winner already. You did a great job. It is ready to go. I did nothing significant to the compliant this time. I only edited a few typos errors here and there in the complaint that you did not see which needed to be edited. I also made about five or less corrections that did not alter what you drafted in any significant way."**

202.     Mr. Madgett spoke with Samuel Zean later the next day and said, he had filed the complaint with the Court and also emailed Samuel Zean on Monday, 7/31/2017, at 3:11 p.m. and said as follows: **"Samuel, quick update. Wells Fargo has been served! We're going to make these guys pay. Cheers."**

203.     Tactically, Mr. Madgett did not include TransUnion Experian and Equifax as defendants with Wells Fargo in the complaint he served Wells Fargo because he didn't intend to let us know they were also defendants to the lawsuit **(See Exhibit F).**

204.     Mr. Madgett intentionally misled us that he filed our Complaint on July 27, 2017 only against Wells Fargo and had also served Wells Fargo.

205.     We asked Mr. Madgett several times thereafter and he repeatedly confirmed he served Wells Fargo.

206.     However, on August 18, 2017 a website called www.pacermonitor.com indicated that the lawsuit had been filed on August 18, 2017 and Equifax, Experian and Trans Union were also included as Defendants to the lawsuit, unknown to us. **(See Exhibit G)**

207.     No wonder, Mr. Madgett was making inquiries about our credit disputes on 07/10/2017 but on 07/12/2017 he promised to inform us whether we have claims under FCRA causes of action against Equifax, Experian and Trans Union but failed to do as promised **(See Exhibit A).**

208.	We contacted Mr. Madgett later about it and asked him why was it that the complaint he emailed Samuel Zean to edit on Thursday, 7/27/2017 didn't include Equifax, Experian and Trans Union as defendants but only Wells Fargo and yet, www.pacermonitor.com was indicating he had actually filed our case against Wells Fargo as wells as Equifax, Experian and Trans Union.

209.	Mr. Madgett told us that he had planned on telling us about it. Indeed, we have proven beyond all reasonable doubt that Mr. Madgett's July 5, 2017 letter is misleading and was purposely recently created but then backdated to perpetrate a cover up for his corrupt and illegal misconducts.

**Different Sets of Arguments More Favorable To Mr. Madgett Regarding His Misleading Claims, Still Don't Pass The Truth Test**

210.	Paragraph 2 of Mr. Madgett's Complaint states: **"On July 5, 2017, Counsel finished his evaluation and accepted Respondents' matter based on additional conditions."**

211.	Even if we were to agree that Mr. Madgett met with us and we accepted his additional conditions, his explanation above is still nonsensical, baseless and defective.

212.	DocuSign policy and user requirement requires that all parties must sign the document via DocuSign to protect the integrity and validity of the agreement as that specific system and technology is designed.

213.	DocuSign policy and user requirement also requires that any addition of document to the signed agreement be uploaded and transacted electronically between the parties to maintain the validity of the agreement.

214.	Paragraph 5 of Mr. Madgett's Complaint states: **"Because Counsel added additional conditions to the firm's standard agreement, Counsel later voided the Zeans' signed online contingency agreement."**

215.	Again, his calculated misrepresentation above is so defective, it doesn't pass the truth test.

216.	Even if we are to agree with Mr. Madgett that he decided to add terms and conditions to the agreement and met with us concerning this on July 5, 2017, then logically why didn't he just produce a new printed hard copy agreement there and then, in order for all parties to sign.

217.   Mr. Madgett subsequently knew how to make sure we sign all his fraudulent nondisclosure settlement distribution sheets with our legible signatures, knowing quite well he had no valid existing contract with us.

218.   The fact that he even added additional conditions to DocuSign agreement plus failed to sign himself electronically before deleting and voiding the agreement, was in violation of agreement and voided it according to DocuSign policy and user requirement.

A Copy and Paste DocuSign Policy/Requirements:

How do digital (DocuSign) signatures work?

**"When a signer electronically signs a document, the signature is created using the signer's private key, which is always securely kept by the signer. The mathematical algorithm acts like a cipher, creating data matching the signed document, called a hash, and encrypting that data. The resulting encrypted data is the digital signature. The signature is also marked with the time that the document was signed. If the document changes after signing, the digital signature is invalidated. To protect the integrity of the signature, PKI requires that the keys be created, conducted, and saved in a secure manner, and often requires the services of a reliable Certificate Authority (CA). Digital signature providers, like DocuSign, meet PKI requirements for safe digital signing."**
        **Source:     https://www.docusign.com/how-it-works/electronic-signature/digital-signature/digital-signature-faq (See Exhibit H)**

219.   What is a Certificate Authority (CA)?

**"Digital signatures rely on public and private keys. Those keys have to be protected in order to ensure safety and to avoid forgery or malicious use. When you send or sign a document, you need assurance that the documents and the keys are created securely and that they are using valid keys. CAs, a type of Trust Service Provider, are third-party organizations that have been widely accepted as reliable for ensuring key security and that can provide the necessary digital certificates. Both the entity sending the document and the recipient signing it must agree to use a given CA." Source: https://www.docusign.com/how-it-works/electronic-signature/digital-signature/digital-signature-faq (See Exhibit H)**

**"DocuSign services are offered either by subscription or for free as an app. Signatures and documents are encrypted, then treated with a hash to reveal whether the document has been tampered with or compromised. DocuSign Professional emails recipients an electronically signed document requesting review of a document after it is uploaded. Each party must agree to complete business electronically, review the document and apply a signature." Source: https://en.wikipedia.org/wiki/DocuSign (See Exhibit H)**

27

220.    Regardless of what Mr. Madgett misleading claimed now, his dishonesty and deceptive practices have come back to bite him.

221.    The evidence establishes that Mr. Madgett by his fraudulent misconduct, involuntarily invalidated our digital/electronic signatures and therefore invalidated any agreement we thought we had with him.

222.    Although by his own admission, he voided the agreement and thus invalidated our digital signatures, he nevertheless has finally produced a copy of the voided agreement containing our same digital signatures and encrypted data marked with the date (06/29/2017), that the agreement was signed before it became invalidated.

223.    Mr. Madgett is good at forging documents but could not fix his way through this one and so, voided the agreement and hid the fact from us and refused for 9 months to give us his signed copy of the agreement since he was hiding his unauthorized modification to the document.

224.    From everything we've seen, Mr. Madgett never realized that we would discover his fraudulent activity and notify him about it which caused him to forge documents after he received a written response to his questions from us, and so intentionally misrepresented his complaint at ¶ 1, ¶ 2, ¶ 3, ¶ 4; and especially ¶ 5 **(See Exhibit I).**

225.    Exhibit I contains discoveries that we made that are timestamp with the discovery dates and also includes a letter we wrote to Mr. Madgett in response to his questions as recently as May 17, 2018 which Mr. Madgett deliberately distorted and is attempting to mislead this Court as being written in July 2017 as he portrayed in his complaint at ¶ 5.

226.    Arguably, the evidence is clear that it was at this point when Mr. Madgett wrote that misleading letter to address everything he said and quoted above.

**WE ARE UNDER NO CONTRACT, NOR UNDER ANY LEGAL OBLIGATION TO PAY MR. MADGETT OR MADGETT LAW, LLC. ANY MONEY.**

227.    Due to the above we are under no legal obligation to pay Mr. Madgett or his law firm Madgett Law LLC. any money for the TransUnion, Experian and Equifax cases he already settled.  Therefore, he or Madgett Law LLC is not entitled to any percentage of our funds he already received, and we are entitled to 100% of all funds

228.     Also, we are not obligated to Mr. Madgett or his law firm Madgett Law LLC for any attorney fees for Comcast or Wells Fargo not only because he withdrew from the case and his contract even if it was valid doesn't have any provision to pay the firm if the attorney withdraws, but also because the agreement was later voided and altered.

229.     Since Mr. Madgett now admitted that he canceled the agreement and voided it and cannot prove that Eunice Zean was at his office on July 5, 2017 to sign a new agreement, and cannot prove that Samuel Zean signed a new agreement, therefore, there is no existing agreement between the parties.

230.     The contract that Mr. Madgett altered is only legibly signed by him and bears only his own personal legibly known signature.

231.     Noticeably, his altered contract is dated on July 5, 2017 in his own handwriting.

232.     On the contrary, that signature does not bear both of our personal legibly known signatures or handwritings.

233.     Since Mr. Madgett misleadingly claimed that he discussed his unauthorized modification of the agreement with us on July 5, 2017, the new agreement he claimed he give us must indicate that we signed that new contract in our own legible handwritings, which must have been also dated July 5, 2017.

234.     We have proven that Eunice Zean was not present and so could not have given consent to or signed a new contract even at that.

235.     Rather, the agreement that David Madgett has, which he emailed and disclosed to us on May 17, 2017, and also already submitted to arbitration on May 23, 2018, has our digital signatures and is dated June 29, 2017.

236.     David Madgett is currently pursuing us systematically on two fronts. Through Court and through Arbitration.

237.     By Mr. Madgett's own admission, he canceled and thus voided that specific DocuSign agreement dated June 29, 2017.

238.     Even if David Madgett had not voided our original agreement which he never signed on DocuSign, the

fact that he altered the original agreement after we had signed it and has only recently disclosed it to us on May

17, 20178, renders that agreement invalid and unenforceable by law.

239.     There is no evidence in Mr. Madgett's intentionally forged and altered agreement that convincingly, or on

the surface, shows that we consented to or received his forged letters and altered agreement, let alone were

aware of his forgery and modification and accepted it.

240.     If anything, all the evidence instead established that Mr. Madgett failed and refused to give us his signed

copies of his agreement even after we emailed him repeated and relentless requests within the last 9 months

since to do so.

241.     For any modification to a contract to be considered valid, all parties must agree to the subsequent

changes.

242.     If any party does not agree to a contract modification, the changes are not likely to be enforceable.

However, in this case, the evidence shows that we were not even aware of it, let alone agree to it.

**Mr. Madgett Has No Legal Right, Authority or Authorization to Put Liens on Us, Our Cases, and Our House**

243.     **Count I Claim for Unpaid Legal Fees...**

> Mr. Madgett's claim: **Counsel requests an order in the amount of $38,306.87 for unpaid legal fees with regard to Samuel and Eunice Zean v. Wells Fargo Bank, N.A.; Experian Information Solutions, Inc.; Equifax Information Services, LLC; Trans Union, LLC served on Defendants, Case No. 17-cv-03817 (JNE/HB).**

244.     By Mr. Madgett's own admission he voided our original agreement with him.

245.     Mr. Madgett hid that fact from us until re recently discovered it on May 17, 2018 when emailed an altered

version of the agreement. Under contract law, such an agreement is invalid and therefore unenforceable.

246.     Even if we were to agree the contract was still valid which of course it is not, still there are no provisions

in the original agreement that we DocuSign to award the attorney for any fees even if he withdraws.

247.     Therefore, Mr. Madgett has no established legal right to have unlawfully confiscated funds, put a lien on

our house.

248.    Mr. Madgett's liens are therefore, unlawful, wrongful and meritless and should be denied.

249.    We ask the Court for damages resulting from Mr. Madgett's unlawful liens.

250.    Mr. Madgett and Madgett Law LLC although altered/voided, it nevertheless, specifically states as follows:

**"If I make no recovery, I owe the Firm nothing for legal services." (See Exhibit D)**

251.    In view of the fact and evidence, Mr. Madgett's conduct were intentional and no existing agreement between parties was existed and Mr. Madgett knew this fact and conceal it from us with criminal intend, we ask this court to award us 100% of all our settlement funds with Mr. Madgett and Madgett's Law LLC.

252.    **Count I Claim for Unpaid Legal Fees Continues...**

Mr. Madgett's claim: **43. Mr. Samuel Zean entered into a second agreement for legal services dated October 2, 2017. 44. Mr. Zean again failed to pay fees in the amount of $15,225.00 associated with that matter, Zean v. Comcast et. al., Case No. 0:17-cv-05117 (WMW-KMM).**

253.    Mr. Madgett also forged the Comcast's agreement and hid it from Samuel Zean to date which explains why he has failed to disclose it.

254.    Mr. Madgett has refused to give Samuel Zean a copy of the Comcast's agreement even after Samuel Zean signed it in the presence of his wife Eunice Zean on October 2, 2017.

255.    Samuel Zean has repeatedly requested the signed copy of Mr. Madgett, but he has consistently refused.

256.    Mr. Madgett even submitted his complaint for arbitration and submitted his altered/voided Wells Fargo agreement but even at that, he failed to also submit his signed copy of the Comcast's agreement because he doesn't want Samuel Zean to see it and has refused to give Samuel Zean his signed copy.

257.    This is gross ethic violation and unprofessional conduct.

258.    Samuel Zean and Eunice Zean have enclosed Affidavit of Declarations that when Samuel Zean signed his Comcast's agreement, not only did Mr. Madgett not also sign the agreement, he refused to do so and promised to email Samuel Zean a copy after he later signs it.

259.    Samuel Zean and Eunice Zean also confirm in our Affidavit of Declarations that when Samuel Zean signed his Comcast's agreement, it was the same as the Madgett Law LLC. Wells Fargo agreement they had signed on DocuSign except for the Defendants. **(See Attached Affidavit)**

260.     Even importantly, Madgett law LLC. agreement even if it wasn't altered/voided, it nevertheless, specifically states as follows: **"If I make no recovery, I owe the Firm nothing for legal services."**

261.     Arguably, Mr. Madgett was not fired but withdrew from the case over the exposure of his illegal practices and deceptive conducts and made no recovery for Samuel Zean at the time of his withdrawal.

262.     Besides, even if Mr. Madgett or Madgett Law LLC. agreement was not intentionally altered by Mr. Madgett after Samuel Zean signed it, it makes or has no provision to award the attorney for any fees if the attorney withdraws.

263.     Mr. Madgett's liens are therefore, unlawful, wrongful and meritless and should be denied.

264.     We ask the Court for damages resulting from Mr. Madgett's unlawful liens.

265.     **Count I Claim for Unpaid Legal Fees Continues...**

     Mr. Madgett's claim: **"45. Mr. Zean entered into a third agreement to pay legal fees related to the matter Zean v. Mary T., Inc., et al., Case No. 27-CV-17-18118, via a series of emails in January of 2018. 46. Mr. Zean incurred legal fees in the amount of $3,675.00 related to that matter. 47. Mr. and Mrs. Zean have to date failed to pay their outstanding legal fees. 48.Respondents are in breach of their agreements."**

266.     Mr. Madgett has exhibited lack of professionalism, and unethical conduct.

 He has also demonstrated lack of credibility and honesty.

267.     First, we do not have any existing valid agreements with Mr. Madgett.

268.     Second, even if we he had valid agreements with us, he would have been in multiple breaches of his own agreements for the countless reasons already explained above in this complaint, including those below.

269.     Mr. Madgett altered agreement specifically states as follows: **"I will receive an itemized bill of each such cost."**  However, Mr. Madgett produced none as promised.

270.     Mr. Madgett's altered agreement also specifically states as follows: **"I will receive an itemized statement showing any such deduction from my settlement/ judgment funds."** Again, Mr. Madgett produced none as promised.

271.     Mr. Madgett agreement also specifically states as follows: **"Pursuant to Paragraph E. above, I assign the right to collect any costs and disbursements advanced by the Firm on my behalf to the Firm. Said costs will be deducted from any recovery after the calculation of the Firm's contingent fee."**

272.     Mr. Madgett failed to do as agreed above but perpetrated a clever and strategic scam in his fraudulent coaxing of a trust fund in order to hold our personal settlement money in a retainer or trust fund account with the intent for such costs and disbursements of our own money advanced or spent by him to yet be deducted from any recovery after the calculation of the Firm's fee as if it was the firm's own money it had spent.

273.     Mr. Madgett illegally and wrongfully put a lien on Samuel Zean unrelated case, Samuel Zean vs. Mary T. Inc., Maria Kangas although with no contract or agreement that gave him the legal right to do so.

274.     This is a country of law and order and if even Samuel Zean legitimately owed Mr. Madgett any money for his unrelated case, Samuel Zean vs. Mary T Inc., Maria Kangas, there are laws and procedures to legally handle such dispute.

**PLAY BY PLAY EVENTS REGARDING SAMUEL ZEAN VS. MARY T. INC., MARIA KANGAS**

275.     Mr. Madgett and Samuel Zean verbally agreed that he only spend a total of three (3) hours or less to make *specific* suggestions on Samuel Zean's complaint and Mr. Madgett agreed and made a mere 7 suggestions on the entire complaint and emailed Samuel Zean **(See Exhibit J).**

276.     Samuel Zean emailed Mr. Madgett on Sunday, January 7, 2018 at 11.27 a.m. and said as follows:

> **"I have nowhere to turn today but this is too urgent before they dismiss my case. I didn't do as underline in the copied and paste below from a Court order from some case I researched over the internet. That was in Federal Court. Am I also require to do as underline and highlighted below. Dave, I will be truly grateful for your prompt and urgent reply because my case could be in danger and if so, I may need to work on that today to submit or file with the Court."**

277.     Samuel Zean thought Mr. Madgett would just do this on a courtesy for him but he was wrong and didn't realize that Mr. Madgett would not honor his agreement.

278.     Mr. Madgett responded Sunday, January 7, 2018 as follows:

> **"Hi Samuel, I really want to help, but my partners strictly forbid me from working on a case were we don't have a representation agreement in place. Moreover, in order to**

**help I'd really have to better understand how we got to this position. Do you want to set up a time on Wednesday morning to discuss this case and see how we can help out?"**

279.    Mr. Madgett, as far as we know, works solo and doesn't have a partner.

280.    Samuel Zean met Mr. Madgett on Wednesday, January 17, 2018 at 9:30 am and took Eunice Zean to serve as a witness to the discussion.

281.    Mr. Madgett told Samuel Zean he could spend a total of five hours according to him to reduce cost on Samuel Zean, but Samuel Zean felt that it was too much and negotiated him down to three hours and the two agreed in the presence of Eunice Zean.

282.    Later that Wednesday, January 17, 2018, at 11:01 p.m., Samuel Zean emailed his complaint to Mr. Madgett: **"Hi David, Per our discussion today I have attached my complaint against the above."**

283.    However, days later on January 23, 2018 at 10:59 a.m., Mr. Madgett surprisingly emailed Samuel Zean as follows: **"Hi Sam! I'm going to get working on this right away, you have $2500.00 of credit with the firm. So, I'll just bill you hourly against that; thus, it should not cost you anything out of pocket. Should I proceed?"**

284.    Samuel Zean was surprised and didn't what reply or think based on the fact that Mr. Madgett who had just agreed to help Samuel Zean out and that he would charge Samuel Zean for three hours from our money he had but was now saying something else.

285.    By then we did not know nor realize that Mr. Madgett was not someone who lives up or sticks to his promise but finds a way to manipulate a given situation such as this.

286.    He said this to test us.

287.    Hence, Samuel Zean thought to consult with his wife and so responded on January 23, 2018 at 11:05 a.m. as follows: **"Thanks David for the response.  However, please hold on or hold off until you receive further instruction from me to either proceed or abort altogether.  I want to discuss with my wife first and get her approval."**

288.     On Tuesday, January 23, 2018 at 11:43 a.m. Mr. Madgett responded: **"Ok Just make sure you give me enough time to make everything look really good!"**

289.     On Tuesday, January 23, 2018 at 11:45 a.m., Samuel Zean responded: **"I will David. Thanks."**

290.     Based on Eunice Zean advice not to agree to what Mr. Madgett was now requesting but stick to the deal and not let Mr. Madgett loosely take all of our money and claimed to work unlimited hours only to provide a few simple suggestions, Samuel Zean spoke with Mr. Madgett again and reminded him of their deal again with Eunice Zean listening.

291.     Mr. Madgett responded by saying he had forgotten we discussed three hours limit or a total of $1,125.00 and asked Samuel Zean to send his complaint.

292.     About three days later, on Tuesday, January 30, 2018 at 8:40 p.m., Mr. Madgett emailed Samuel Zean and said as follows: **"*I'm not billing you for the full time*, you have a good complaint. Keep reading and cut anything that does not absolutely have to be there."**

Although Mr. Madgett promised he would bill Samuel Zean half time ($562.50) of what they discussed and acknowledged that it was Samuel Zean himself, that had done all of his work on his complaint, however, to our surprise, Mr. Madgett did a sloppy work himself and didn't do much on the complaint.

293.     In response Samuel Zean emailed Mr. Madgett on Saturday February 17, 2018 at 7:00 a.m. and said as follows:

> **"Hi David, In regard to my response I emailed you yesterday, I am not worried or concern it as much as I am about my Complaint.  If I take the same old complaint that does not conform or plead as the defendants have been arguing and demanding, my response can be as effective and strong as it is right now before I emailed it to you yesterday, but I may still have my Complaint dismissed.  I know you previously reviewed it but only made a couple recommendations here and there but that was before we got their memorandum or motion to dismiss.  I am losing sleep over the compliant the way it currently is."**

294.     However, in spite of that message and disappointment over his lack of work and reluctance to do as agreed, Mr. Madgett did not bother to respond.

295.     So, Samuel Zean yet again emailed Mr. Madgett on Monday, February 19, 2018 at 9:52 a.m. as follows:

"Dave, please do not bother any longer to go over or send me your suggestions on my response I emailed you. I told you I was serving today and already did. I was a little upset and disappointed yesterday because the complaint suggestions you made in the complaint and emailed me could not be used and I had to reedit my entire original complaint that I originally sent you. That was very disappointing and upsetting. I am not mad at you necessarily. You put the complaint in some format which I was not able to remove. I just could not use the complaint because each time that I tried to remove the format which you put it in, the complaint would mess up further with lines. The printout was so terrible that made it impossible to use. You are very hard to get so I didn't bother to contact you and just decided to redo my complaint. Please see what I am talking about in the attachment."

296.    Mr. Madgett did not respond, and so Samuel Zean emailed him as follows on Tuesday, February 20, 2018 at 10:03 p.m. as follows:

"Can you please disburse a check of our portion of the funds left in our account. Can you also please send us invoices on the settlements, who settles and how they settled and current balance."

297.    Mr. Madgett did not respond yet again to the specific question and so Samuel Zean emailed him again as follows on Tuesday, March 3, 2018 at 7:05 a.m. as follows:

"David, although you are not required to render me any free help with my Mary T. case, as we already discussed, I do not see the point why you will email me the question below and asked me to send you the requested information...: "Hi Samuel! What is this January 17 order these guys are talking about? Can you send me that?" However, after I did send you the information as you asked, you declined to respond to me in spite of the multiple follow up I made through phone calls, text messages and emails. It took me effort to locate, scan and send you the information although in vain. I will not bother you with this case anymore, and I am sorry I bothered you yesterday. I only did because I am not an attorney and I have an important hearing about this case on Monday and wanted to know whether what these guys are saying is true that I was not supposed to respond, not to send affidavit, not to submit my fourth amended complaint and not to do basically anything in response to their motion in spite of what the Court later ordered. I needed answer to these basic questions in order to speak in front of the judge like someone that knows what he is talking about. But I guess you are not even willing to help me with this simple request which could end my case on Monday or help to save it."

298.    There is nowhere in Samuel Zean email chain/correspondences with Mr. Madgett where Samuel Zean instructed Mr. Madgett to spend any number of hours on his complaint other than what the both verbally discussed and agreed to in the presence of Eunice Zean who served as a witness to the discussion and has submitted an Affidavit of Declaration to that effect.

299.    Mr. Madgett has provided no such evidence to the contrary and cannot produce any evidence to the contrary as the burden of proof rests upon him.

300.    Mr. Madgett has been misleading about the hours he spent in his complaint and is his avaricious attempt to extract money from us.

301.    Per the verbal agreement, with Eunice Zean being the witness, Mr. Madgett was to subtract $1,125 from our money he continuously held and refused to disburse but promised to charge only $562.5.

302.    Mr. Madgett has seriously breached the agreement by failing to do as agreed on, as his method of payment, and although took that money from our funds he held, but returned recently in his attempt to fraudulently distort us.

303.    Mr. Madgett overstep his authority or bond and has illegally and wrongfully put an unwarranted retaliatory and fraudulent lien on Samuel Zean's unrelated case, Samuel Zean vs. Mary T. Inc., Maria Kangas.

304.    If what Mr. Madgett has claimed is true, where is his invoice, work or payment order that he emailed to Samuel Zean?

305.    Mr. Madgett did a sloppy work in violation of his agreement as Samuel Zean correspondences to him confirmed.

306.    Which is why Mr. Madgett specifically made the following promise in view of his sloppy work as follows: **"*I'm not billing you for the full time.*"**

307.    He did nothing!  He even promised to look at Samuel Zean motion free as a result to make some suggestions for him and even at that he failed to deliver as promised.

308.    Although, he was as disappointing as the evidence shows, he is now seeking to take advantage of us to wrongfully extract money from us through misleading means.

309.    Mr. Madgett has the burden to produce any email correspondence wherein he showed Samuel Zean he spent more than 3 hours, or a billing statement he submitted to us for payment other than saying to subtract hourly (agreed three hours) from our settlement funds although later emailed us that he didn't charge us for the full three hours.

310.     Mr. Madgett took the law in his hands to put a lien on Samuel Zean unrelated case, although with no contract or agreement that gave him the legal right or authority to do so.

311.     This is a country of law and order and even if Samuel Zean legitimately owed Mr. Madgett any money for his unrelated case, Samuel Zean vs. Mary T Inc., Maria Kangas, there are laws and process to legally handle such dispute.

312.     **Count II Claim for** Count II Collection Costs...

    Mr. Madgett's claim:

> **"10 49. Pursuant to the terms of the agreements between the parties, counsel is entitled to costs and fees incurred in collecting unpaid legal fees. 50. To date counsel has incurred over 11 hours of time attempting collection of these matters entitling counsel to $4125.00 in collection costs."**

313.     Your Honor, the statements and claims by Mr. Madgett above shows you his lack of creditability, as nothing he says is factual.

314.     The statements above show how bold and head-on, the risk that Mr. Madgett is willing to take and push his luck knowing quite well there is evidence to prove him wrong and that he made absolutely zero attempt to collect debts.

315.     Our emails correspondences will show Mr. Madgett and us who spent hours, days and months attempting to collect debts from the other.

316.     Mr. Madgett is counting on this court to award him attorney fees and other misleading charges he didn't earned and does not deserve, while also already sent the same demands to arbitration to bind us to arbitrate our dispute with him.

317.     We are so confident we are willing to bet our case against his blatant attempt to mislead and defraud even this Court by his claims, seeking to extract money.

318.     Our dispute with Mr. Madgett started about May 5, 2018; hence, we have submitted the entire email chain of correspondences between us and Mr. Madgett from May 1, 2018 through May 28, 2018 **(See Exhibit K).**

319.   We and Mr. Madgett have not spoken by phone since perhaps April 1, 2018. Our primary means of communication is via email as has been proven.

320.   Hence, if this Court finds anywhere in our email correspondences with Mr. Madgett from the above Exhibit K, wherein he even attempted one single hour of debt collection effort, this Court must award Mr. Madgett all his misleading and fraudulent demands he is requesting.

321.   This should speak volume and should derail this man's credibility if he has any.

322.   Mr. Madgett usually speaks as if he has a partner, staff, (paralegal or legal assistance etc.); although he has none and is a one man show and operates alone.

323.   On Thursday, May 17, 2018 at 4:24 p.m. David Madgett emailed us and said: **"Here are the times the judge has available for a hearing: 14 June any time after 3:30. 18 June any time after 2:30.**

324.   He again added, **"Also, <u>I need to know what the basis for your complaint is</u>. I have to file a memo today, so <u>I really need you to reply to my previous email requesting you confirming the basis for your dispute."</u> (See Exhibit L)**

325.   David Madgett was intentionally misleading and trickery when he gave us a false date and time as the date and time judge would be available for a hearing.

326.   David Madgett purposefully misled because he wanted us to miss that hearing so that the judge will rule in his favor on his entirely misleading complaint.

327.   David Madgett was finally compelled to disclosure the actual hearing date to us only after the Court sent him an email and specifically asked him to contact us about the content of that email and the hearing date

328.   Even at that David Madgett again attempted to mislead us and sent this email as follows: **"You need to attend the hearing on June 6 at 9:00 A.M."**

329.   When he finally realized that he had mistakenly forwarded us the Court's email, he then reversed course and said: **"Sorry hearing is actually June 7 at 9:00 see attached notice."**

330.   On September 18, 2017, we received a correspondence from Mr. Madgett that he had reached a settlement agreement with Equifax for $2,500.00.

331.    The correspondence from David Madgett on Tuesday, September 12, 2017 at 11:04 a.m. specifically and misleading had a subheading that says: **"$2500 From Equifax"** confirms this fact: **(See Exhibit M)**

332.    Also, David Madgett specifically marketed his misrepresentation to us with a subheading that says "$2500 From Equifax;" and included phrases such as ***"We should take this..."*** and ***use the money to go after Wells Fargo..."***

333.    Of course, we had no other options but to agree to please David Madgett because he had repeatedly threatened not to fully litigate Wells Fargo if we didn't; and repeatedly coerced and brainwashed us about the important of him using our portion of our settlement funds for his costs and expenses to litigate Wells Fargo **(See Exhibit M)**.

334.    If Trans Union, Experian and Equifax settlement funds was previously agreed by the contract on July 5, 2017, for such funds to be used for the attorney's fees as David Madgett has falsely stated in his voided/altered and forged agreement and also in his complaint, then why would he say what he said above and in other similar correspondences for months **(See Exhibit M)**.

335.    David Madgett cunningly and strategically also included a "Settlement Distribution" sheet for us to sign that reflected or corroborated the "Agreed Settlement Amount" from the Equifax's matter as being $2500.00. **(See Exhibit B)**.

336.    The "Settlement Distribution" sheet also showed an amount of $4,000.00 for Attorneys' Fees Negotiated pursuant to fee shifting under 15 U.S.C. § 1681 and specifically said, Agreed Settlement Dollar Amount being $2500.

337.    David Madgett forgot one day and left the actual Equifax settlement agreement in the conference room with Samuel Zean to answer a phone call.

338.    Samuel Zean spotted the agreement read it in his absence.

339.    Samuel Zean asked him why was it that the settlement agreement was showing that the case was settled for $6500 but he told us $2500.

340.    He misleadingly told Samuel Zean that he didn't want Equifax to write two separate checks and that his attorney fees that he had negotiated in the amount of $4000 was included that's why.

341.    He then gave Samuel Zean a copy which was the only copy or disclosure he ever made to us under the circumstances and asked that Samuel Zean take it home to have Eunice Zean sign it.

342.    Mr. Madgett should not be practicing law in Minnesota in view of his conduct and practices.

343.    Mr. Madgett has intentionally and unconsciously done all he done to us knowingly, unfairly and unjustly.

344.    Mr. Madgett reasoning is that we look different, talk different, have a different background and so, are nobody and no one will listen to us over an aspiring attorney even in the face of overwhelming, undeniable evidence of his guilt, his gross wrongdoing and his illegal conducts because he is invisible.

345.    However, we are still hopeful that he will be proven wrong and there are objective fact finders in this great state of Minnesota that based their decision not on the color of one's skin or how they look, talk, or where they come from, but based solely on the application of the law and based on the evidence and fact only.

346.    A lawyer owes certain duties to his or her clients, including a duty to avoid conflicts of interest, a duty to provide competent representation, and others.

347.    As a representative of clients, a lawyer performs various functions.

348.    As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications.

349.    As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

350.    As negotiator, a lawyer seeks a result advantageous to the client over himself but consistent with requirements of honest dealings with others and his clients.

351.    As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others.

352.    For example, a lawyer who commits fraud in the conduct of a business is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

353.    If the lawyer persists in a course of action involving his services that the client reasonably believes is criminal or fraudulent, the client reserves the right to file charges against the lawyer, file a lawsuit against the attorney or terminate the attorney.

354.    Mr. Madgett has caused irreparable damage to us and all our case including most especially our house. We may not be able to find lawyers again to represent any of our cases and may be forced to represent ourselves and will certain to lose our cases.

355.    Mr. Madgett had purposely done all this not only to financially exploit us but also in retaliation against us for exposing him and discovering his illegal conducts.

356.    All of Mr. Madgett's demands should be denied and we be awarded our full settlement funds with Mr. Madgett and Madgett Law LLC and be awarded for other damages and for stress, pain and suffering resulting from Mr. Madgett and Madgett Law LLC. conduct.

357.    Mr. Madgett is aware that Samuel Zean suffers from constant headaches and has had two major brain surgeries but nevertheless, decide to defraud our family in this manner and has unjustly and undeservingly subjected us to such immense pain and suffering.

358.    Mr. Madgett bold behavior is Grossly representative of an autocratic behavior we hear of in the Banana Republic.

359.    Mr. Madgett has psychologically, mentally and emotionally damaged us, especially in view of our remaining cases with Wells Fargo and Comcast and our pursuit of attorneys' representations now.

360.    He has initiated a scorched earth mentally and conduct on all our cases in his attempt to personally injure us by damaging our cases and ruining our lives so that we can be unjustly and undeservingly indebted to him.

361.    As a result of David Madgett's conducts, we have been severely damage, suffered immense pain and suffering, experienced stresses, headaches, sleeplessness, anxieties and fear.

**Prayer for Relief**

WHEREFORE, Claimants, on behalf of themselves, respectfully prays for Judgment to be entered in favor of Claimants and against Respondents as follows:

a.    Declaratory Judgment that Claimants do not owe Respondents any money from any of their cases involving Wells Fargo, Trans Union, Equifax and Experian;

b.    Declaratory Judgment that Claimants do not owe Respondents any money from any of their cases involving Comcast, Trans Union;

c.    Declaratory Judgment that Claimants do not owe Respondents any money from any Samuel Zean's case involving Mary T. Inc.

d.    Declaratory Judgment that Respondents are not entitled to arbitrate his dispute with Claimants because of the forgery, unauthorized modification to the agreement and invalidity of his agreement.

e.    Declaratory Judgment that Respondents wrongfully and illegally put Liens on Claimants, the house, and their cases;

f.    Declaratory Judgment that Respondents are guilty of ethic violation of his profession, and is guilty of legal malpractice;

g.    Declaratory Judgment that Respondents are not entitled to take any portion of Claimants' settlement funds from any of their cases and Claimants are entitled to 100% of their entire settlements funds;

h.    Declaratory Judgment that Respondent Mr. Madgett is removed from Claimants cases due to fraud, fraudulent misrepresentation, fraudulent nondisclosure, misrepresentation falsification, forgery, aggregated forgery, theft, criminal wrongdoing, distortion, blackmail, ethic violation and legal malpractice.

i.    statutory damages;

j.    actual damages;

k.    damages resulting from Respondents' confiscation of all Claimants' mortgage documents, their piles of documents for all their cases he currently has in his possession

and has refused to give Claimants in his attempt to prevent Claimants from finding a new lawyer;

l.      damages for pain and suffering Claimants have experienced and suffered due to Respondents' conducts;

m.      current damages and potential damages that has and may result from Claimants' cases;

n.      injunctive relief prohibiting such conduct in the future;

o.      reasonable Claimants' fees for their complaint, litigation expenses, and cost of suit; and

p.      Any other relief deemed appropriate by this Honorable Court.

Date: May 28, 2018                    Respectfully Submitted,


                                      s/ Samuel Zean, Eunice Zean (Self Representations)
                                      **PRO SE PLAINTIFFS**
                                      Samuel Zean, Eunice Zean
                                      8708 62nd Ave. North
                                      Brooklyn Park, MN
                                      (651) 528-1594
                                      samuelzean@hotmail.com
                                      eunicezean@hotmail.com

                                      **PLAINTIFF FOR THEMSELVES**
                                      **Acknowledgement**

Plaintiff acknowledges that, pursuant to Minn. Stat. Sec. 549.21 sub. 2, the Court in its discretion may award costs, disbursements, reasonable attorney's fees and witness fees to the parties against whom costs, disbursements, reasonable attorney's fees and witness fees were charged in bad faith.

Dated: May 28, 2018                   By: /s/ Samuel Zean, Eunice Zean
                                              Samuel Zean, Eunice Zean